## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **MICHELLE PALMERI,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:17-cv-00901** |
| | ) | **Judge Aleta A. Trauger** |
| **GOODWILL INDUSTRIES OF** | ) | |
| **MIDDLE TENNESSEE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Goodwill Industries of Middle Tennessee ("Goodwill") has filed a Motion to Amend Answer (Docket No. 25), to which Michelle Palmeri has filed a Response (Docket No. 33), and Goodwill has file a Reply (Docket No. 41). Goodwill has also filed a Motion for Summary Judgment (Docket No. 27), to which Palmeri has filed a Response (Docket No. 35), and Goodwill has filed a Reply (Docket No. 42). Palmeri has filed a Motion for Summary Judgment and Leave to File Under Seal (Docket No. 31), to which Goodwill has filed a Response (Docket No. 37), and Palmeri has filed a Reply (Docket No. 43). For the reasons set out herein, the motion to amend will be granted and the motions for summary judgment will be denied, with the exception of Palmeri's request to place certain documents under temporary seal.

## I. BACKGROUND

Palmeri was hired by Goodwill as a store manager on February 2, 2004. (Docket No. 38 ¶ 1.) Over time, Palmeri became involved in training other managers and assisting with management on a district-wide level. (*Id.* ¶ 2.) In 2010, she was promoted to the position of District Manager. As District Manager, Palmeri was responsible for nine stores and over 400 employees. (*Id.* ¶¶ 3–4.) During her time at Goodwill, Palmeri never received a performance

evaluation with a total score of "Below Expectations," "Unsatisfactory," or "Below Requirements." (*Id.* ¶ 5.) On March 1, 2015, Palmeri received a merit-based raise of $949.48 per year. (*Id.* ¶ 9.) In May 2014, she received what appears to have been her last performance review before she was terminated. (*See* Docket No. 32-3 at 65.) She received a score of 3.73 out 5, which qualified as "Effective" and fell shortly below "Highly Effective." (Docket No. 38 ¶ 6.) On August 14, 2015, she was terminated, allegedly for having made errors in her reported mileage on travel reimbursement forms. (*Id.* ¶ 7.)

At the time she was fired, Palmeri's annual salary was $57,949.80. (*Id.* ¶ 8.) She has identified a number of other Goodwill district managers—both men and women—who made the following salaries:

| District manager | Start date in position | Salary (2014) | Salary (2015) | Citation |
|---|---|---|---|---|
| Michelle Palmeri | 2010 | $57,000.32 | $57,949.80 | Docket No. 38 ¶¶ 8–9. |
| Vicki Spurlin | 2000 | $70,000.00 | $70,345.21 | *Id.* ¶¶ 10–11. |
| Jennifer Martin | 2014 | $56,000.00 | $56,276.16 | *Id.* ¶¶ 12–13. |
| Lisa Binkley | 2015 | N/A (different position) | $56,000.00 | *Id.* ¶ 14. |
| Jerry Vick | Unknown (2004-2010) | $67,378.48 | N/A (different position) | *Id.* ¶¶ 17–18. |
| George Houck | 2006 | $68,000.19 | $69,360.19 | *Id.* ¶¶ 15–16. |

Goodwill also gave a number of district managers raises at or around the same time, in different amounts:

| District manager | Start date in position | Date Raise Received | |
| --- | --- | --- | --- |
| | | **November 23, 2014** | **March 1, 2015** |
| Michelle Palmeri | 2010 | N/A | $949.48 (*Id.* ¶ 9.) |
| Vicki Spurlin | 2000 | N/A | $345.21 (*Id.* ¶ 11.) |
| Jennifer Martin | 2014 | N/A | $276.16 (*Id.* ¶ 13.) |
| Lisa Binkley | 2015 | N/A | N/A |
| Jerry Vick | Unknown (2004-2010) | $1,962.48 (*Id.* ¶ 18.) | N/A |
| George Houck | 2006 | N/A | $1,360 (*Id.* ¶ 16.) |

Each of the raises was considered merit-based. (*Id.* ¶¶ 9, 11, 13, 16, 18.)

Palmeri testified that her supervisor, Jeffrey Luther, had often made derogatory and sexist comments to her, including comments denigrating the intelligence of other women employees and mocking Palmeri for being blonde and "air-headed." (*Id.* ¶ 22.) She also testified that Luther had once overruled her recommendation that a male store manager be terminated, telling her, instead, to transfer the employee because "maybe he just cannot work for a female." (*Id.* ¶ 23.)

Palmeri's job involved a substantial amount of driving, because she was required to visit each store in her district on a regular basis. (Docket No. 36 ¶ 8.) She submitted monthly mileage expense vouchers to request reimbursement for the miles that she drove. (*Id.* ¶¶ 9, 12.) On the vouchers, Palmeri was required to identify each individual trip, the store visited, the date, the mileage she drove, the business purpose of the visit, and the dollar amount requested. (*Id.* ¶ 10.) Palmeri has conceded that she may have entered erroneous information on her mileage vouchers for three days, June 11, 17, and 19, 2015. Those errors, she explains, consisted of instances where she did, in fact, engage in work-related travel, but she misidentified which store she

visited and, therefore, calculated the mileage incorrectly. She attributed any error to the amount of stress she was under and the large amount of driving she was being required to do. (*Id.* ¶ 15.)

Palmeri's errors were uncovered in a purportedly random audit by Goodwill's Loss Prevention Department. (*Id.* ¶ 18.) Three loss prevention employees reviewed security camera footage from the stores that Palmeri had cited on her forms to determine if she actually visited those stores on the relevant days. (*Id.* ¶ 21.) That review appears to have confirmed that Palmeri did not visit the stores in question; the loss prevention employees, however, did not review footage from other nearby stores to see if Palmeri's error had simply been with regard to which store she visited, rather than whether the travel occurred. (*Id.* ¶¶ 24–27.) On August 6, 2015, Goodwill's Director of Loss Prevention met with Palmeri and Luther to discuss the findings. (*Id.* ¶ 28.) Palmeri maintains that, in the meeting, she explained that she may have simply put the wrong store locations for the travel performed. (*Id.* ¶ 29.) On August 14, 2015, Goodwill terminated Palmeri, ostensibly for her filing of false mileage vouchers. (*Id.* ¶ 30.)

Goodwill concedes that any financial impact of Palmeri's errors was "nominal" (*Id.* ¶ 32), and Palmeri has introduced a decision from the Tennessee Department of Labor & Workforce Development's Employment Security Division Appeals Tribunal, in which the Tribunal examined the allegations against Palmeri and concluded that her error, at least with regard to the travel considered by the Tribunal, was actually in Goodwill's favor—resulting, ultimately, in a six-dollar loss by Palmeri (Docket No. 32-16 at 2).[1] Goodwill maintains that it fired Palmeri, despite the fact that Palmeri apparently did not financially benefit from the misstatements and Goodwill was not economically harmed, because "Goodwill holds its District Managers to high standards of integrity and accountability." (Docket No. 36 ¶ 32.)

---

[1] Goodwill disputes the admissibility of the Appeals Tribunal's decision. Even if the decision is not admissible, however, Goodwill's concession that Palmeri caused no more than nominal loss confirms the general conclusion that Palmeri's errors were not to her meaningful benefit.

Palmeri testified that other district managers—in particular, Houck and Vick—had, in the past, stated that they would sometimes intentionally "not put the correct distance" for their mileage and instead underreport the mileage, so as to fall under mileage reimbursement caps, and that they anticipated doing so in the future to avoid a proposed policy requiring car rentals for mileage over the caps. (Docket No. 29-1 at 158.) She also testified that Luther told her that, when he was a district manager, he would intentionally structure his travel schedule to avoid the mileage caps. (*Id.* at 16). Goodwill has offered a Declaration by its Director of Human Resources, Sheila Holt, stating that "it is not a violation of any Goodwill policy for District Managers to underreport mileage" and "not a violation of any Goodwill policy for District Managers to plan their store visits to stay within Goodwill's daily or monthly mileage caps on travel." (Docket No. 29-2 ¶¶ 28–29.) Holt also claims that, as of the time of Palmeri's termination, neither the Loss Prevention Department nor Human Resources was aware of any other district manager who had submitted mileage expense vouchers that could not be substantiated by surveillance video. (*Id.* ¶ 26.)

On May 30, 2017, Palmeri filed a short, four-page Complaint in this case. (Docket No. 1.) She claimed that Goodwill's claimed reason for her firing was pretextual and that she was, in fact, terminated because of her sex. (*Id.* ¶¶ 9, 11.) The Complaint also claims that "Palmeri, as a female district manager (one of few females in Tennessee) was paid less than similarly situated district managers who were male." (*Id.* ¶ 10.) The Complaint pleads causes of action for sex discrimination in violation of Title VII and the Tennessee Human Rights Act ("THRA"), as well as for unequal pay under the federal Equal Pay Act. (*Id.* ¶ 13.)

On July 14, 2017, Goodwill filed an Answer. (Docket No. 10.) In the Answer, Goodwill denies that its reason for firing Palmeri was pretextual and denied, without further explanation,

the claim that Palmeri was paid less than similarly situated male district managers. (*Id.* ¶¶ 9–10.) Goodwill also identifies a number of "Additional Defenses." (*Id.* at 3–4.)

On September 11, 2017, the court entered an Initial Case Management Order. (Docket No. 13.) That Order provided that "[a]ny motions to amend or to add parties shall be filed by no later than December 1, 2017." (*Id.* at 2.) The court set a deadline of June 1, 2018, for dispositive motions. (*Id.* at 3.) The deadline for motions to amend passed without either party's filing such a motion.

As part of discovery, Palmeri issued Interrogatories to Goodwill. Palmeri's Fifth Interrogatory asked Goodwill to identify "Plaintiff's salary or rate of pay at the time of termination and describe all employee benefits that Plaintiff lost as a result of the termination." (Docket No. 33-2 at 5.) Her Sixth Interrogatory asked Goodwill to "state or produce other documentation of the name, sex, salary or rate of pay, and benefits of all (a) store managers, (b) assistant store managers, (c) district managers, and (d) other management-level employees of Goodwill Industries of Middle Tennessee at the time of Plaintiff's termination." (*Id.*) After a delay necessitated, Goodwill argues, by the lack of an agreed-upon protective order (Docket Nos. 18, 26 at 2, 41 at 4), Goodwill eventually produced the requested payroll information, limited to the time of Palmeri's termination. (*See* Docket No. 41-1.) On April 24, 2018, counsel for Palmeri sent counsel for Goodwill a letter objecting to the scope of the information provided:

> Plaintiffs' Interrogatory requests documentation for "employees of Goodwill Industries of Middle Tennessee at the time of Plaintiff's termination." Defendant seems to have interpreted this to mean that Plaintiff was requesting pay information only from the time of her termination (August 2015). This is incorrect. Rather, the final clause plainly refers to "*employees* . . . at the time of Plaintiff's termination" (emphasis added). *All* manager pay information, including information from before August 2015, is highly relevant to Plaintiff's Equal Pay Act claim.

(*Id.* at 1.) The parties' disagreement on the question of whether Palmeri was entitled to historical payroll information continued, and the court held a telephone conference on May 10, 2018, after which the court ordered Goodwill to "produce pay records for the four individuals mentioned in the telephone conference, going back three years from the date of the plaintiff's termination." (Docket No. 23 at 1.)

On June 1, 2018, both parties filed Motions for Summary Judgment. (Docket Nos. 27 & 31.) Goodwill, however, also filed an untimely Motion to Amend, seeking to amend its Answer to

> include an affirmative defense as articulated by the Equal Pay Act ("EPA") whereby any wage differential between what female[] employees were earning and what male[] employees were earning at relevant times was based on a seniority system, a merit system, a system which measures earnings by quantity or quality of production, or any other factor other than sex, or a combination thereof.

(Docket No. 25 at 1.)

## II. LEGAL STANDARD

### A. Motion to Amend

Federal Rule of Civil Procedure 15(a) governs amending pleadings before trial. A party may amend a pleading once as a matter of course either (a) within twenty-one days after serving it, or (b) if the pleading is one to which a responsive pleading is required, within twenty-one days after service of a responsive pleading or twenty-one days after service of a motion under Rule 12(b), (e) or (f), whichever is earlier. Fed. R. Civ. P. 15(a)(1). In all other cases, a party may only amend a pleading by obtaining the opposing party's written consent or receiving leave of the court. Fed. R. Civ. P. 15(a)(2). Where it is requested, the court should "freely" give leave when justice so requires. *Foman v. Davis*, 371 U.S. 178, 182 (1962). However, a request to amend a pleading after a scheduling order's deadline for doing so is construed as both a request for leave

to amend and for modification of the schedule; accordingly, the moving party must demonstrate "good cause" for allowing the amendment. Fed. R. Civ. P. 16(b)(4); *see Leary v. Daeschner*, 349 F.3d 888, 907 (6th Cir. 2003) (holding that a party seeking to amend a pleading in contravention of a scheduling order must satisfy both Rule 15 and Rule 16).

A motion to amend, moreover, may be denied where there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 520 (6th Cir. 2010) (quoting *Foman*, 371 U.S. at 182). Moreover, "[a] proposed amendment is futile if the amendment could not withstand a Rule 12(b)(6) motion to dismiss." *Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000) (citing *Thiokol Corp. v. Dep't of Treasury, State of Mich.*, 987 F.2d 376, 382–83 (6th Cir. 1993)).

## B. Motions for Summary Judgment

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To win summary judgment as to the claim of an adverse party, a moving defendant must show that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim. Once the moving defendant makes its initial showing, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Conversely, to win summary judgment as to its own claims, a moving plaintiff must demonstrate that no genuine issue of material fact exists as to all essential elements of her

claims. "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. 242, at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## III. ANALYSIS

### A. Motion to Amend

The Equal Pay Act sets a baseline rule that no covered employer "shall discriminate . . . between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which he pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1). That general rule, however, comes with an important statutory exception, namely that a difference in pay between otherwise qualifying employees of opposite sexes is permissible "where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." *Id.* Because the employer's legitimate reason for the pay differential is set out as an *exception* to the Equal Pay Act's general prohibition—rather than merely a negation of the plaintiff's case-in-chief—it

has been construed by the courts as an affirmative defense. *See Murphy v. Ohio State Univ.*, 549 F. App'x 315, 318 (6th Cir. 2013) (citing *Balmer v. HCA, Inc.*, 423 F.3d 606, 612 (6th Cir. 2005); *Kovacevich v. Kent State Univ.*, 224 F.3d 806, 826 (6th Cir. 2000)). Generally speaking, a party that seeks to rely on an affirmative defense "must affirmatively state" that defense in its responsive pleading. Fed R. Civ. P. 8(c)(1). Goodwill did not raise an affirmative defense based on its pay differentials' being justified by a factor other than sex in its Answer, nor did it seek to do so before the court's deadline for amending pleadings. It seeks to make such an amendment now.

Goodwill argues that good cause exists for it to be allowed to amend its Answer in violation of the court's Scheduling Order because Palmeri's scant pleading, combined with her actions during discovery, led Goodwill to believe, mistakenly, that its interests would be adequately served by merely disputing Palmeri's *prima facie* case under the Equal Pay Act. In particular, Goodwill points out that it originally read Palmeri's Interrogatories as focusing only on any pay differentials that existed at the time of her termination. If Palmeri's claims were confined to salaries as of the date of her termination, she would not be able to rely specifically on the widely different merit-based raises that were given in the preceding months, and she would be unable to cite Jerry Vick as a comparator, because Vick was no longer a district manager at the time. Only when it realized that it would have to defend Palmeri's pay throughout the relevant period, Goodwill argues, did it recognize the need to plead the affirmative defense.

The court notes, initially, that nothing Goodwill has offered provides justification for its original failure to plead the affirmative defense in its Answer. While Palmeri's Complaint was short, it was more than adequate to put Goodwill on notice that Palmeri was pursuing an Equal Pay Act Claim. (*See* Docket No. 1 ¶ 13.B.) Palmeri's description of the relevant pay differential,

moreover, was not limited to a differential at the time she was terminated. She stated merely that she "was paid less than similarly situated district managers who were male." (*Id.* ¶ 10.) The "factor other than sex" affirmative defense, moreover, is hardly some obscure issue that Goodwill could not have anticipated. It is an express statutory defense that exists in the very same subsection as the Equal Pay Act's liability provision, 29 U.S.C. § 206(d)(1), and its litigation is wholly routine in Equal Pay Act cases. *See Cooper v. United Airlines, Inc.*, No. 13-CV-2870 JSC, 2014 WL 836674, at *1 (N.D. Cal. Feb. 28, 2014) ("In response to Equal Pay Act claims under Section 206(d), a defendant will commonly defend a disparity in pay as being justified by some 'factor other than sex.'") (citation omitted). Goodwill, moreover, pled several other commonly relied-upon affirmative defenses in discrimination cases. (Docket No. 10 at 3–4.) Goodwill's omission of this particular affirmative defense in its Answer, therefore, seems inexplicable as anything other than an oversight.

The good cause required here, however, is not good cause for Goodwill's having omitted an important defense from its initial pleading, but good cause for the court's departing from its Scheduling Order to allow an amendment. Fed R. Civ. P. 16(b)(4). Counsel for Goodwill has made a plausible argument that they were confused about the scope of the claims Palmeri intended to pursue and that Palmeri's actions in discovery, innocently or not, contributed to that confusion. The court, therefore, must consider whether Goodwill's confusion would actually justify, or at least explain, its failure to seek an amendment sooner.

Goodwill suggests that, if it merely had to defend itself against an Equal Pay Act claim based on its August 2015 salary figures, there would have been no need to rely on any affirmative defense, because Palmeri would have been unable to make out her *prima facie* case. "To establish a *prima facie* case for an EPA claim, a plaintiff must show that an employer paid

different wages to an employee of the opposite sex for substantially equal work." *Crowder v. Railcrew Xpress*, 557 F. App'x 487, 494 (6th Cir. 2014) (quoting *Kovacevich v. Kent State Univ.*, 224 F.3d 806, 826 (6th Cir. 2000)). In August 2015, Palmeri was making $57,949.80 a year. Her sole identified male peer, George Houck, was making $69,360.19 a year. There can be little doubt that that differential would be enough to support a *prima facie* case under the Equal Pay Act, assuming all other requirements were met. Nevertheless, Goodwill posits that Palmeri's *prima facie* case would fail, with regard to the 2015 figures, because one female district manager, Vicki Spurlin, was making slightly more than Houck, who was junior to her by several years. Goodwill, however, has not identified any case law that would support the conclusion that identifying one highly paid female employee would defeat an Equal Pay Act claim. To the contrary, several courts, including the Supreme Court, have held that the existence of highly paid female comparator employees "does not preclude [the] plaintiff from establishing a *prima facie* case." *Love v. AutoZone Stores, Inc.*, No. 1:12 CV 2260, 2013 WL 5797677, at *4 n.3 (N.D. Ohio Oct. 28, 2013) (citing *Corning Glass Works v. Brennan*, 417 U.S. 188, 208 (1974)); *cf. Connecticut v. Teal*, 457 U.S. 440, 455 (1982) ("Title VII does not permit the victim of a facially discriminatory policy to be told that he has not been wronged because other persons of his or her race or sex were hired. That answer is no more satisfactory when it is given to victims of a policy that is facially neutral but practically discriminatory.").

Indeed, allowing the existence of one highly paid woman to defeat, categorically, an Equal Pay Act claim would conflict with the "broadly remedial" purposes of the Act, *Corning Glass Works*, 417 U.S. at 208, by requiring some plainly meritorious claims to fail for no reason based in the statute itself. One can imagine, for example, a workplace where all employees are paid pursuant to a formula based on seniority and qualifications, with the exception that every

woman is paid $1000 less than every identically qualified and experienced man. That workplace might have many women who are paid more highly than many men. The highest paid employee might even be a woman, if that woman's experience and qualifications happened be enough for her to warrant a salary more than $1000 higher than the highest-paid man. It is difficult to imagine, however, how one could argue that that hypothetical employer would be in compliance with the Equal Pay Act's prohibition on "paying wages to employees . . . at a rate less than the rate at which he pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions," unless pursuant to a reason other than sex. 29 U.S.C. § 206(d)(1). Goodwill, however, endorses a reading of the statute that would require the court to grant summary judgment in the employer's favor in such a situation. Without some basis in case law or statutory text for adopting such a rule, the court will not do so. Goodwill's confidence that it could defend the August 2015 salaries based solely on the *prima facie* case was, therefore, mistaken, and the court is, accordingly, unconvinced that confusion about the date range of Palmeri's Equal Pay Act claim can wholly explain the delay in seeking to amend the Answer.

Nevertheless, Goodwill's confusion does complicate matters. A defendant's merely realizing that it failed to plead a defense of which it should have been aware is not typically good cause sufficient to justify allowing the amendment of an answer in violation of a scheduling order. *See, e.g.*, *Nourison Rug Corp. v. Parvizian*, 535 F.3d 295, 298 (4th Cir. 2008); *Sherman v. Winco Fireworks, Inc.*, 532 F.3d 709, 717 (8th Cir. 2008); *A Love of Food I, LLC v. Maoz Vegetarian USA, Inc.*, 292 F.R.D. 142, 144 (D.D.C. 2013); *cf. U.S. ex rel. Martin Marietta Materials, Inc. v. Nelson, Inc.*, 286 F.R.D. 327, 331 (W.D. Tenn. 2012) (denying motion to amend answer to raise counterclaims in violation of scheduling order). Goodwill's omission,

however, appears, at least in part, to be the result of not merely Goodwill's failing to realize it needed to raise the defense, but also its misunderstanding of facts relevant to how important the affirmative defense would be. While the strategy of focusing solely on the *prima facie* case may always have been inadvisable, Goodwill may well be correct that it is *more inadvisable* if one considers pay decisions made prior to August 2015, in particular Goodwill's supposedly merit-based raises and the availability of an additional, highly-paid male comparator. Goodwill's confusion, therefore, is not irrelevant.

Moreover, the nature of the particular defense here also weighs in favor of allowing amendment. As the court has noted, the defense that Goodwill wishes to raise is a commonplace and predictable feature of litigation under the Equal Pay Act. On one hand, that makes Goodwill's omission hard to understand. On the other hand, however, the centrality of the "factor other than sex" defense to Equal Pay Act cases also means that Palmeri's counsel should have predicted, from the beginning, that this defense would likely be raised in response to her claim.[2] Accordingly, one of two possibilities appears likely to be true: either Palmeri did not realize, until recently, that Goodwill's omission amounted to a waiver, in which case Palmeri would not be prejudiced by allowing amendment now; or Palmeri realized the gravity of Goodwill's error and waited patiently until it was too late for the error to be easily fixed, then, understandably, sought to reap the fruits. There is nothing, of course, inherently wrong with a litigant's taking advantage of her opponent's mistake. However, insofar as the court has some discretion under the Federal Rules of Civil Procedure with regard to whether to depart from its own deadlines, *see Leary*, 349 F.3d at 908, the court can consider whether it should apply the

---

[2] Moreover, the likelihood that Goodwill would raise such a defense would have been further confirmed by Goodwill's claim, in the theory of the case it offered in the Initial Case Management Order, that "[a]ll personnel actions challenged by Plaintiff were taken by Defendant solely for legitimate business reasons." (Docket No. 13 at 2.)

Rules in a way that would serve little purpose other than rewarding one litigant for allowing the other's error to go uncorrected.

Goodwill has identified other courts that have permitted a defendant to raise a "factor other than sex" defense, despite omitting it from its original answer and allowing a substantial delay, because the omission was not in bad faith and raising the defense would not prejudice the plaintiff. *See, e.g.*, *Edwards v. Fulton Cty., Ga.*, 509 F. App'x 882, 887–88 (11th Cir. 2013); *Dennis v. Dillard Dep't Stores, Inc.*, 207 F.3d 523, 526 (8th Cir. 2000). The particular circumstances of every case will differ, of course, and this situation presents a close call. Ultimately, however, the court concludes that good cause exists for departure from the scheduling order and the interests of justice require allowing the amendment. Regardless of what was pled, there is little doubt that the question of why Palmeri was paid less than some other district managers has always been at the heart of the equal pay portion of this case. Not allowing amendment would artificially limit the scope of the questions at issue to the point that Palmeri would virtually be entitled to a default judgment, at least with regard to aspects of her claim. Moreover, although the parties' actions in discovery do not fully justify Goodwill's delay, Goodwill appears to be correct that Palmeri's own slack pace in advancing discovery likely prevented the issue from coming to a head sooner. The court, accordingly, will grant leave to amend the Answer and will consider the motions for summary judgment in the context of Goodwill's having raised an affirmative defense.

## B. Motions for Summary Judgment

### 1. Equal Pay Act

As the court has already noted, a *prima facie* case under the Equal Pay Act consists of showing "that an employer paid different wages to an employee of the opposite sex for

substantially equal work." *Crowder*, 557 F. App'x at 494 (quoting *Kovacevich*, 224 F.3d at 826). "Once a plaintiff has proven her prima facie case, the burden shifts . . . to the defendant to provide one of four affirmative defenses: '(1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any other factor other than sex.'" *Warf v. U.S. Dep't of Veterans Affairs*, 713 F.3d 874, 881 (6th Cir. 2013) (quoting *Buntin v. Breathitt Cty. Bd. of Educ.*, 134 F.3d 796, 799 (6th Cir. 1998)).

As comparators, Palmeri offers two men who were district managers during all or part of Palmeri's own tenure in that position—George Houck and Jerry Vick—as well as Jeffrey Luther, whom Palmeri identifies as her predecessor. Goodwill's sole argument that Palmeri has failed to establish her *prima facie* case with regard to Houck and Vick is the aforementioned suggestion that Vicki Spurlin's high pay negates the fact the Palmeri was paid less than male district managers. As the court explains above, the standard for a *prima facie* case under the Equal Pay Act does not require Palmeri to show that all male comparators were paid better than all female comparators. Moreover, Goodwill's argument based on Spurlin's pay is especially inapposite with regard to Goodwill's decision to grant disproportionate raises, because Spurlin's raise was one of the lowest. Finally, the fact that Spurlin was paid only slightly more than Houck, despite the fact that she had been a district manager much longer, would seem, if anything, to support Palmeri's allegations. George Houck and Jerry Vick are, therefore, appropriate comparators who were paid more than Palmeri, and she has established her *prima facie* case with regard to them.

Whether Palmeri may also rely on Luther as a comparator, however, is more complicated. Palmeri is correct that, generally speaking, a plaintiff "may meet her prima facie burden by demonstrating a wage differential between herself and her predecessor." *Buntin*, 134 F.3d at 799 (citing *Gandy v. Sullivan County, Tenn.*, 24 F.3d 861 (6th Cir. 1994)); *see also Bielawski v. AMI*,

*Inc.*, 870 F. Supp. 771, 775 (N.D. Ohio 1994) ("The act applies not only where the plaintiff is paid less than members of the opposite sex employed at the same time as the plaintiff, but also where the plaintiff is paid less than predecessors.") (citing *Hodgson v. Behrens Drug Co.*, 475 F.2d 1041, 1049 n. 11 (5th Cir. 1973)).

Determining whether Luther was actually Palmeri's predecessor in the sense contemplated by the Equal Pay Act case law, however, has been surprisingly difficult. In her Statement of Undisputed Material Facts, Palmeri writes: "Plaintiff testified in her deposition that Jeffery Luther, a man, who was the District Manager for her district immediately prior to her taking the job, made more when he was District Manager than she did after she was promoted to the same position." (Docket No. 38 ¶ 21.) In its Response, Goodwill disputes the fact generally, but does not specifically take issue with the premise that Luther was Palmeri's predecessor in "the same position." Instead, it merely suggests that Palmeri's testimony is insufficient to establish the fact asserted and cites to the portion of its own Statement of Undisputed facts addressing Luther's salary and position. (*Id.*)

Unfortunately, the initial discussion of Luther in Goodwill's Statement is conspicuously incomplete. Goodwill first claims that "Jeff Luther was a District Manager from November 2002 to September 2003, and he earned an annualized salary of $43,000.00." (Docket No. 36 ¶ 51.) Goodwill's next discussion of Luther's position and salary states that, "[a]t the time he was promoted to Director of Retail, Jeff Luther was paid an annualized salary of $96,000.00." (*Id.* ¶ 53.) Human Resources documentation of Luther's salary suggests that the $96,000 salary was instituted, along with that promotion, in 2015. (Docket No. 35-1.) Goodwill offers no explanation for the twelve-year gap between 2003 and 2015, despite that being the period in

which Luther allegedly would have been, according to Palmeri's account, her immediate predecessor.

After considerable prodding, Goodwill, in its Reply in support of its summary judgment motion, finally explains that, from September 2003 until May 2010, Luther held a position known, at one time, as "Regional Manager," but later renamed "District Manager II." (Docket No. 42 at 6 & n.5.) In a supplemental Declaration by Goodwill Human Resources Director Sheila Holt, Holt states that the duties and responsibilities of Luther, as "District Manager II," were different from those of an ordinary district manager—although Holt provides very little explanation of how they were different, other than that "Mr. Luther had additional responsibilities for store development in West Tennessee." (Docket No. 42-2 ¶ 6.) In 2010, Luther was promoted to Assistant Director of Retail, and Palmeri was promoted to District Manager, but, according to Holt, Palmeri "did not take over all the responsibilities held by Mr. Luther as District Manager II." (*Id.* ¶¶ 7–9.)

It is difficult for the court to understand why the basic facts of what Luther did from 2003 to 2010 have been so difficult to draw out. The result, though, is that there appears to be a dispute of material fact with regard to whether Luther would be an appropriate comparator. While Palmeri has established that Luther was, in some sense, Palmeri's predecessor, neither party has produced sufficient evidence to give the court an understanding of the full scope of Luther's duties from 2003 to 2010 and whether they were meaningfully broader than, or different from, Palmeri's. Although Goodwill's unresponsiveness has clearly contributed to that lack of clarity, the burden to establish the *prima facie* case is ultimately Palmeri's. With regard to Luther, she has not shown that she is entitled to summary judgment on that point. However, because she has, at least for the purposes of the present motions, established her *prima facie* case

with regard to Houck and Vick, the burden shifts to Goodwill to establish its reason for the pay differential with regard to those two employees.

Goodwill argues that Houck and Vick's higher salaries were justified by their greater experience, both at Goodwill and in retail generally. According to Holt, both Houck and Vick had many years of experience in retail and retail management. Specifically, "[i]n August 2015, District Manager George Houck had been employed with Goodwill for over eight (8) years and had many years of previous experience in multi-unit retail management." (Docket No. 29-2 ¶ 39.) "Prior to being employed by Goodwill, Jerry Vick had ten (10) years of experience as a retail store manager, three (3) years of experience as a district manager, two (2) of experience as a director of store operations, and sixteen (16) years of experience as a retail buyer." (*Id.* ¶ 43.) Holt claims that the district managers' salaries were "based on a number of factors, including but not limited to time in position, tenure, job performance and relevant experience," but not including sex. (*Id.* ¶¶ 53–54.) Holt also notes that, when Houck and Vick were new in their district manager positions, their salaries had been considerably lower. Specifically, Houck's starting salary as a district manager had been $46,000 and Vick's had been $46,009.60. (*Id.* ¶¶ 40, 42.)

As Palmeri notes, terse, general statements about Houck's and Vick's experience from Goodwill's Human Resources Director are far from enough for Goodwill to be entitled to summary judgment on Palmeri's Equal Pay Act claims. Goodwill has offered little explanation of what that experience consisted of or how it played a role in Goodwill's salary-setting practices, let alone established that experience and qualifications were the actual, but-for cause of the salary differential. Goodwill has, however, offered enough to defeat Palmeri's own motion. Houck's and Vick's seniority and experience provide a plausible justification for their

higher levels of pay.[3] There is, therefore, a disputed issue of material fact with regard to whether Goodwill's district manager salaries were set on the basis of a factor other than sex. The court will, accordingly, deny both motions with regard to the Equal Pay Act claim.

## 2. Title VII/THRA (Pay Discrimination)

The Sixth Circuit has stated that, "when an Equal Pay Act claim and a Title VII claim arise out of the same set of underlying facts, both stating a charge of wage discrimination, 'the standards of liability under the two statutes are sufficiently similar' that the disposition with respect to the two claims should be the same."[4] *Crowder*, 557 F. App'x at 494 (citing *Clark v.*

---

[3] Palmeri argues that Goodwill should be barred from relying on some of the evidence it has produced because it failed to timely provide that evidence in discovery. *See* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."). Without prejudice to any ruling about admissibility of any particular evidence at trial, the court finds that, even if the relevant historical pay records are excluded, sufficient issues of disputed material fact exist to preclude a grant of summary judgment in Palmeri's favor.

[4] As some courts have observed, however, construing the Equal Pay Act and Title VII together does raise at least one complication—namely, that the burden-shifting framework under the Equal Pay Act is different from the burden-shifting framework that courts use in most Title VII cases. As a result, some federal circuits have suggested that, in rare cases, the outcomes of the two types of claims might diverge. *See, e.g.*, *King v. Univ. Healthcare Sys., L.C.*, 645 F.3d 713, 724 (5th Cir. 2011) ("[W]here a plaintiff makes an adequate prima facie case for both an EPA and a Title VII claim, the defendant bears the burden of *persuasion* to prove a defense under the EPA, whereas it has only a burden of *production* to show a legitimate nondiscriminatory reason for its actions under Title VII, with the ultimate burden of persuasion remaining with the plaintiff. As such, where the defendant proffers a reason for its pay differential other than sex, but does not prove that reason by a preponderance of the evidence, the plaintiff will succeed on an EPA claim while still bearing the burden of persuasion under Title VII."); *Bauer v. Curators of Univ. of Missouri*, 680 F.3d 1043, 1045–46 (8th Cir. 2012) ("An employer under the EPA carries the burden of persuasion and must prove an affirmative defense; a Title VII defendant need only articulate a defense."); *Fallon v. Illinois*, 882 F.2d 1206, 1217 (7th Cir. 1989) ("It is possible that a plaintiff could fail to meet its burden of proving a Title VII violation, and at the same time the employer could fail to carry its burden of proving an affirmative defense under the Equal Pay Act."); *Brewster v. Barnes*, 788 F.2d 985, 987 (4th Cir. 1986) (holding defendant liable under the EPA but not Title VII). At this juncture, the court will follow the general rule adopted by the Sixth Circuit and construe the two statutes together. *But see Beck-Wilson v. Principi*, 441 F.3d 353, 360 (6th Cir. 2006) ("The burden shifting under the EPA differs from the Title VII framework, in which a 'defendant need only assert a legitimate, non-discriminatory reason for the different treatment afforded the plaintiff as compared to her similarly situated male co-workers,' at which point the burden shifts back to the plaintiff to show pretext. Under the EPA, however,

*Johnson & Higgins*, No. 97–4233, 1999 WL 357804, at *3 (6th Cir. May 28, 1999); *Kahn v. Dean & Fulkerson, P.C.*, No. 99–1015, 2000 WL 1769582, at *9 (6th Cir. Nov. 13, 2000); *Lacey v. Robertson*, No. 99–1424, 2000 WL 876491, at *2 (6th Cir. June 21, 2000) (order); *Henry v. Lennox Indus., Inc.*, 768 F.2d 746, 752 (6th Cir. 1985)); *see also Korte v. Diemer*, 909 F.2d 954, 959 (6th Cir. 1990) ("Conduct that a jury finds to be 'based on' sex, and not motivated by nondiscriminatory reasons, cannot later be found by a district court to lack an intent to discriminate on the basis of sex. We therefore hold that the jury's verdict for [the plaintiff] under the Equal Pay Act is binding on the district court as to her Title VII claim."). The parties agree, moreover, that the analysis governing Palmeri's Title VII claims should govern her THRA claims. *See Bailey v. USF Holland, Inc.*, 526 F.3d 880, 885 n.1 (6th Cir. 2008) ("The analysis of claims brought pursuant to the THRA is identical to the analysis used for Title VII claims."). Accordingly, the disputed issues of material fact that preclude granting either motion with regard to the Equal Pay Act also prevent the court from granting them with regard to Title VII or the THRA.

### 3. Title VII/THRA (Termination)

A plaintiff may prove unlawful discrimination by proffering either direct or indirect evidence. *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 302 (6th Cir. 2016). To analyze Title VII claims using indirect evidence, the Sixth Circuit applies the burden-shifting approach established by the *McDonnell Douglas* line of cases. *Id.*; *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Under this approach, Palmeri must first establish the elements of a *prima facie* case. To do so, she must show that she was (1) a member of a protected class, (2) subject to an adverse employment action, (3) qualified for her position, and (4) replaced by a

---

the plaintiff 'never bears the burden of persuasion regarding the affirmative defenses.'") (quoting *Buntin*, 134 F.3d at 799–800 n. 6–7).

person outside the protected class or treated differently than similarly-situated employees outside the protected class. *Tennial*, 840 F.3d at 302 (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992)). Only if Palmeri can establish these elements does the burden shift to Goodwill to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802.

Goodwill's Memorandum in support of its Motion for Summary Judgment does not argue that Goodwill is entitled to summary judgment with regard to Palmeri's termination because Palmeri cannot establish her *prima facie* case, but rather proceeds directly to the question of pretext.[5] (Docket No. 28 at 6–10.) In Palmeri's Memorandum in support of her motion, she devotes one short paragraph to her termination-related claim, in which she advances minimal argument that she is entitled to summary judgment on that count. (Docket No. 32 at 20.) Palmeri, moreover, does not appear to dispute that Goodwill has proffered a legitimate, nondiscriminatory reason for her termination in the form of the travel voucher allegations against her. Accordingly, the only issue before the court with regard to the termination claims is whether Goodwill is entitled to summary judgment on those claims because Palmeri has failed to produce evidence sufficient for a reasonable juror to conclude that she has established pretext.

Palmeri argues, first, that a reasonable juror could find pretext on the ground that her mileage errors were an insufficient basis for termination. In particular, she notes that her errors

---

[5] In so doing, Goodwill appears to be conflating the pretext analysis with the analysis under the fourth element of the *prima facie* case. In order to establish the fourth element of the *prima facie* case with regard to a disciplinary termination, a plaintiff typically must show that her proposed comparators engaged in acts of "comparable seriousness." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006) (quoting *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002)). While Goodwill recognizes the issue of whether Plameri has identified anyone who engaged in an act of comparable seriousness, it only does so with regard to pretext, not the fourth *prima facie* element, and concedes that the issue is only one way to demonstrate pretext and, therefore, is not, in and of itself, determinative. (*See* Docket No. 28 at 9 ("The third method of proving pretext would consist of evidence that similarly situated employees outside the protected class were not terminated for the same or similar conduct.").) The court will confine its analysis above to the argument actually raised by Goodwill.

were easily explainable as inadvertent and that Goodwill concedes that any economic injury was nominal, if it existed at all. Terminating a long-serving employee who appears to have been successful within the organization for such a minor infraction is, Palmeri suggests, in and of itself suspicious. *See N.L.R.B. v. Health Care Mgmt. Corp.*, 917 F.2d 1304 (Table) (6th Cir. 1990) (noting that the "implausibility of the employer's asserted reasons for its actions" may be evidence of pretext).

She points next to the fact that other district managers are alleged to have knowingly underreported mileage and/or structured travel for non-business reasons to avoid reimbursement caps, but those managers were not terminated. Goodwill responds that Palmeri has not produced evidence that Goodwill was aware of the other managers' actions at the time Palmeri was terminated. While that may be true, it is rendered somewhat beside the point, given that Goodwill's Director of Human Resources has confirmed that Goodwill does not forbid either practice. Accordingly, it is clear that Goodwill's position is that, if it had been aware of the other district managers' underreporting, it would have tolerated it.

Similarly, Goodwill also concedes that it tolerates district managers' structuring their travel schedules specifically to stay within reimbursement caps—a practice that would seemingly involve allowing the manager's travel schedule to be dictated by his personal desire to maximize reimbursement, rather than Goodwill's legitimate business needs. For example, if an employee faced a daily mileage reimbursement cap of 100 miles, and he had a legitimate business reason to drive 200 miles, he could double his reimbursement by intentionally and unnecessarily splitting that travel up over two days—which, Goodwill maintains, it would permit. A reasonable finder of fact could conclude that Goodwill's toleration of these distinguishable, but similar, behaviors

undermines its position that the high level of moral rectitude it requires of its managers justified firing Palmeri for her harmless, inadvertent errors.

Palmeri notes further that Goodwill's allegedly discriminatory pay practices, though not directly linked to her termination, are suggestive of an environment of hostility to women. Finally, she points to Luther's history of comments seeming to show that he subscribed to a sexist stereotype of an "air-headed" blonde and the fact that he had, on another occasion, made a comment suggesting that he tolerated a male employee's inability to work for a female manager. *See Steeg v. Vilsack*, No. 5:13-CV-00086-TBR, 2016 WL 6465915, at *2 (W.D. Ky. Oct. 28, 2016) ("[T]he Sixth Circuit has recognized that although stray remarks, 'standing alone, generally do not support an inference of discrimination, the comments . . . are not categorically excludable.' . . . [W]hile it is well-established that such stray remarks are not 'conclusive proof,' they can still 'add color to the employer's decisionmaking processes and to the influences behind the actions taken with respect to the individual plaintiff.'") (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 356 (6th Cir. 1998); *Conway v. Electro Switch Corp.*, 825 F.2d 593, 597 (1st Cir. 1987)).

All of those facts, taken together, are sufficient for a reasonable juror to conclude that Goodwill's ground for dismissal was pretextual. A reasonable finder of fact could find it inherently suspicious that Palmeri, who worked at Goodwill for a number of years, advanced through its ranks to a position of significant responsibility, and had recently received a merit-based pay increase, was dismissed for minor, seemingly inadvertent errors from which she did not even experience any monetary benefit. That suspicion would only be bolstered by Goodwill's position that it generally tolerates at least some inaccurate mileage reporting, if the reporting represents a departure downwards from the mileage actually driven, and that it tolerates district

managers' structuring their travel specifically to maximize reimbursement. Combined with Luther's comments and the pay differential between Palmeri and male district managers, Palmeri has produced enough from which a reasonable juror could find pretext. The court, accordingly, will deny both motions for summary judgment with regard to Palmeri's Title VII and THRA claims arising out of her termination.

## IV. CONCLUSION

For the foregoing reasons, Goodwill's Motion to Amend Answer (Docket No. 25) will be granted, and Goodwill's Motion for Summary Judgment (Docket No. 27) and Palmeri's Motion for Summary Judgment and Leave to File Under Seal (Docket No. 31) will be denied, except with regard to Palmeri's request for some documents to be placed under seal, which will be granted as set forth in the accompanying order.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge